**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No.:    21-cr-00246-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  JASON MCGUIRE,
2.  TIMOTHY STILLER,
3.  JUSTIN GAY,
4.  WESLEY SCOTT TUCKER,

     Defendants.

---

## INDICTMENT

---

The Grand Jury charges that:

## <u>COUNT 1</u>

(Conspiracy to Restrain Trade)

1.      Beginning at least as early as 2012 and continuing through at least early 2019, the exact dates being unknown to the Grand Jury, in the State and District of Colorado and elsewhere, JASON MCGUIRE, TIMOTHY STILLER, JUSTIN GAY, and WESLEY SCOTT TUCKER ("Defendants"), together with co-conspirators known and unknown to the Grand Jury, entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by the Defendants and co-conspirators was a

*per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.    The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States.

I.    <u>BACKGROUND</u>

3.    Broiler chickens are chickens raised to provide meat for human consumption. Several companies ("Suppliers") produced broiler chicken products in the United States for sale either directly or indirectly such as through a distributor and a distribution center ("DC") to restaurants, grocery retailers, and others.

4.    Restaurants, grocery retailers, and others who purchased large volumes of broiler chicken products generally received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly or, in the case of some fast-food restaurants, also known as quick-service restaurants ("QSRs"), having many independent franchisees, through a centralized buying cooperative.

5.    Some purchasers of broiler chicken products used a "cost-plus" pricing model for 8-piece bone-in broiler chicken products (alternatively called "8-piece COB" for 8-piece chicken-on-the-bone) that varied month-to-month or period-to-period depending on the price of chicken feed and that also provided Suppliers with a per-pound margin and an adjustment that was effectively an additional per-pound margin. 8-

piece COB consisted of two breasts, two wings, two thighs, and two drumsticks.

6.     The price of 8-piece COB often served as a base price for other broiler chicken products. Dark meat was often priced at a certain number of cents per pound less than, or "back" from, the price per pound of 8-piece COB. As a result, a smaller number of cents back translated into a higher price for dark meat compared to a greater number of cents back. For example, "30 back" was a higher price for dark meat than "31 back."

7.     Prices for broiler chicken products were sometimes tied to a market index, such as the Urner-Barry Index ("UB"), as an alternative. For example, cases of wings sold in bulk were sometimes priced at the UB per-pound price ("market") and cases of pre-counted wings were sometimes priced at the UB per-pound price plus a specified number of cents per pound ("market plus").

8.     Bidding and negotiations usually occurred annually toward the end of the calendar year and established prices and other price-related terms, including discount levels, for the following calendar year. In some instances, however, bidding and negotiation toward the end of the calendar year established prices and other price-related terms, including discount levels, for multiple calendar years. In yet other instances, bidding and negotiations occurred throughout the year and sometimes established prices and other price-related terms, including promotional discounts, for discrete periods of time.

9.     Bidding and negotiations often involved weekly volume commitments between Suppliers and their respective customers. If, in a given week, a Supplier could

not meet its volume commitment to a customer, the Supplier could often buy broiler chicken products from another Supplier to cover the shortfall. Alternatively, the Supplier could "short" the customer by not fulfilling its volume commitment that week.

10.    Distributors and customers who purchased broiler chicken products from Suppliers often had lines of credit with the Suppliers. Often a negotiable aspect of a line of credit was the term, *i.e.*, the number of days for a distributor/customer to pay a Supplier for broiler chicken products purchased using a line of credit. A line-of-credit term was related to price. A longer term was generally more favorable to the distributor/customer, whereas a shorter term was generally more favorable to the Supplier.

II.    <u>DEFENDANTS, CO-CONSPIRATORS, AND OTHERS</u>

At times relevant to this Indictment:

11.    JASON MCGUIRE was a director and manager at Pilgrim's Pride Corporation ("Pilgrim's") from approximately September 2012 until approximately May 2015, and a vice president at Pilgrim's from approximately March 2015 until approximately May 2016. MCGUIRE left Pilgrim's in approximately May 2016 and began working for one of Pilgrim's competitors in approximately September 2016 as Sales Director. In approximately July 2017, MCGUIRE joined at Supplier-6 as Director of Sales.

12.    TIMOTHY STILLER was a director and manager at Pilgrim's starting in approximately March 2010.

13.    JUSTIN GAY was a sales manager and director at Pilgrim's starting in

approximately 2006.

14.     WESLEY SCOTT TUCKER—who went by "Scott" as his first name— was a sales manager at Pilgrim's starting in approximately September 2012.

15.     Pilgrim's Pride Corporation ("Pilgrim's") was a corporation organized and existing under the laws of Delaware with its headquarters in Greeley, Colorado. Pilgrim's was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

16.     Jayson Penn was an executive vice president at Pilgrim's starting in approximately January 2012. Penn became the President and Chief Executive Officer of Pilgrim's in approximately March 2019.

17.     Roger Austin was a vice president at Pilgrim's starting in approximately February 2007. Austin was supervised by Penn.

18.     Jimmie Little was a sales director at Pilgrim's. Little started with the company in approximately 2000.

19.     William Lovette was President and Chief Executive Officer of Pilgrim's starting in approximately January 2011 until approximately March 2019. Lovette supervised Penn.

20.     Pilgrim's-Employee-7 was a regional sales manager at Pilgrim's starting in approximately 2013.

21.     Pilgrim's-Employee-8, Pilgrim's-Employee-9, and Pilgrim's-Employee-10 were employees of Pilgrim's.

22.     Claxton was a corporation organized and existing under the laws of

5

Georgia with its headquarters in Claxton, Georgia. Claxton was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

23.     Mikell Fries was a sales manager at Claxton starting in approximately 2004. In approximately 2012, Fries was appointed to Claxton's board of directors. In approximately 2016, Fries became the President of Claxton.

24.     Scott Brady was a vice president at Pilgrim's Pride Corporation starting in approximately 1999, and a vice president at Claxton starting in approximately August 2012. Brady was supervised by Fries.

25.     Koch Foods ("Koch") was a corporation headquartered in the State of Illinois. Koch was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

26.     William Kantola was a sales executive at Koch starting in approximately October 2010.

27.     Koch-Employee-1 was an owner of Koch and supervised Kantola.

28.     Koch-Employee-2 was an executive employee of Koch.

29.     Koch-Employee-3 was a manager and director of Koch.

30.     Supplier-3 was a corporation headquartered in the State of Arkansas. Supplier-3 was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

31.     Timothy Mulrenin was a sales executive at Supplier-3 starting in approximately 2000, and a sales executive at Supplier-8 starting in approximately July 2018.

32.     Brian Roberts was a manager and director at Supplier-3 starting in approximately 2012, and an employee of Supplier-4 starting in approximately 2016.

33.     Supplier-3-Employee-1 was an employee of Supplier-3 starting in approximately January 1988.

34.     Supplier-3-Employee-2 was a manager and director at Supplier-3 starting in approximately 2009.

35.     Supplier-4 was a corporation headquartered in the State of North Carolina. Supplier-4 was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

36.     Supplier-4-Employee-1 was an employee of Supplier-4.

37.     Supplier-6 was a corporation headquartered in the State of Arkansas. Supplier-6 was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

38.     Ric Blake was a director and manager at Supplier-6.

39.     Supplier-6-Employee-2 was an employee of Supplier-6.

40.     Supplier-7 was a corporation headquartered in the State of Georgia. Supplier-7 was a Supplier and was engaged in the production and sale of broiler chicken products in the United States. Supplier-9 was a Supplier purchased by Supplier-7 in 2014.

41.     Supplier-7-Employee-1, Supplier-7-Employee-2, Supplier-7-Employee-3, and Supplier-7-Employee-4 were employees of Supplier-7.

42.     Supplier-8 was a corporation headquartered in the State of Maryland.

Supplier-8 was a Supplier and was engaged in the production and sale of broiler chicken products in the United States.

43.    Supplier-8-Employee-1 and Supplier-8-Employee-2 were employees of Supplier-8.

44.    QSR-1 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-1. Cooperative-1-Employee-1 was an employee of Cooperative-1 from approximately June 2008 until approximately May 2014. Cooperative-1-Employee-2 was an employee of Cooperative-1 from approximately August 2004 until approximately February 2017. Cooperative-1-Employee-3 was an employee of Cooperative-1 from approximately May 2014 until approximately December 2014. Cooperative-1-Employee-4 was an employee of Cooperative-1 in 2014.

45.    QSR-2 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-2. Cooperative-2-Employee-1 was an employee of Cooperative-2 starting in approximately July 2008.

46.    QSR-3 was a nationwide restaurant franchise that negotiated directly with Suppliers. QSR-3-Employee-1 was an employee of QSR-3 starting in approximately September 2001. QSR-3-Employee-2 was an employee of QSR-3.

47.    QSR-4 was a nationwide restaurant franchise that negotiated directly with Suppliers. QSR-4-Employee-1 was an employee of QSR-4 starting in approximately 2011.

48.    QSR-5 was a nationwide restaurant franchise that negotiated directly with

Suppliers.

49.     QSR-6 was a nationwide restaurant franchise headquartered in Golden, Colorado, that negotiated directly with Suppliers.

50.     Restaurant-1 was a nationwide restaurant chain that negotiated directly with Suppliers.

51.     Grocer-1 was a nationwide grocery-store chain operating under various brand names in various geographical areas that negotiated directly with Suppliers. Grocer-1-Brand-1 was a grocery-store brand owned by Grocer-1. Grocer-1-Brand-1 operated multiple stores in the State and District of Colorado.

52.     Grocer-2 was a nationwide grocery-store chain.

53.     Distributor-1 was a nationwide food distributor.

54.     Various corporations and individuals not made defendants in this Indictment participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance of the conspiracy.

55.     Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

III.     <u>MEANS AND METHODS OF THE CONSPIRACY</u>

56.     It was part of the conspiracy that MCGUIRE, STILLER, GAY, and TUCKER, together with their co-conspirators known and unknown to the Grand Jury, in

the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States.

57.     It was further part of the conspiracy that MCGUIRE, STILLER, GAY, and TUCKER, together with their co-conspirators, in the State and District of Colorado and elsewhere, utilized that continuing network:

a.     to reach agreements and understandings to submit aligned—though not necessarily identical—bids and to offer aligned—though not necessarily identical—prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States;

b.     to participate in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States, with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

c.     to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by Suppliers and co-conspirators for broiler chicken products sold in the United States.

58.     It was further part of the conspiracy that MCGUIRE, STILLER, GAY, and TUCKER, together with their co-conspirators, in the State and District of Colorado and

elsewhere, discussed protecting, and thereafter acted to protect, the purpose and effectiveness of the conspiracy.

59.    It was further part of the conspiracy that MCGUIRE, STILLER, GAY, and TUCKER, together with their co-conspirators, in the State and District of Colorado and elsewhere, sold and accepted payment for broiler chicken products that are the subject of the allegations in this Indictment in the United States through until at least approximately early 2019.

### *QSR-1's Dark Meat, Wings, and 8-Piece COB Supply for 2013*

60.    In approximately the autumn of 2012, Cooperative-1 was negotiating prices with Suppliers for dark meat, wings, and 8-piece COB supply for calendar year 2013.

61.    It was further part of the conspiracy that on or about August 31, 2012:

a.    Pilgrim's-Employee-10 emailed Penn, Pilgrim's-Employee-9, and several other Pilgrim's employees: "I received a call today from a friendly competitor telling me it's all over the market that Pilgrim's is taking contract pricing up. They thanked us for taking the lead and told me that contrary to what we might hear regarding their company, they are following as are others. Courage…..keep it up guys."

b.    One of the recipients responded to Pilgrim's-Employee-10, Penn, Pilgrim's-Employee-9, and the other Pilgrim's employees: "Nice, rising tide and all that good stuff."

c.    Pilgrim's-Employee-9 responded to Pilgrim's-Employee-10 only and asked: "Who would that friendly competitor be?" Pilgrim's-Employee-10 replied:

"[Supplier-6]. Big meeting took place this week at their corp office in AK. They don't want to lose any opportunity to move their pricing up. They are hearing from some of their customers...you can't do that, and they are saying well we have to. Other companies are on the bubble as we speak...."

62.     It was further part of the conspiracy that on or about September 1, 2012, Penn forwarded Pilgrim's-Employee-10's original email to MCGUIRE and said: "FYI. Do not fwd. not exactly a legal conversation."

63.     It was further part of the conspiracy that from on or about October 8, 2012, through on or about November 28, 2012, relating to the ongoing negotiations with Cooperative-1 there were numerous:

        a.      Communications such as phone calls, text messages and emails between or among co-conspirators,

        b.      meetings and other communications between or among co-conspirators and Cooperative-1, and

        c.      internal Supplier communications.

64.     It was further part of the conspiracy that on or about November 29, 2012, the following communications occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 12:32 p.m | Austin | TUCKER | *Phone Call*: Approx. 7 min. |
| 2:31 p.m. | TUCKER | Austin | *Email*: "This is crude but does it show what we need it to?" and attaching a spreadsheet containing the following table: |

|  |  |  |  | 8 Piece Quotes | |
| --- | --- | --- | --- | --- | --- |
|  |  |  |  | Good Guys | $0.9770 |
|  |  |  |  | [Supplier-6] | $0.9632 |
|  |  |  |  | Claxton | $0.9620 |
|  |  |  |  | Koch | $0.9561 |
| 4:53 p.m. | Austin | TUCKER | *Email:* "You can put [Supplier-9] in at 96.60 Then send to Jayson [Penn]." | | |
| 9:12 p.m. | TUCKER | Penn & Austin | *Email*: Attaching a spreadsheet containing the following table: | | |
|  |  |  |  | 8 Piece Quotes | |
|  |  |  |  | Good Guys | $0.9770 |
|  |  |  |  | [Supplier-9] | $0.9660 |
|  |  |  |  | [Supplier-6] | $0.9632 |
|  |  |  |  | Claxton | $0.9620 |
|  |  |  |  | Koch | $0.9561 |

65.      It was further part of the conspiracy that on or about November 30, 2012, Penn emailed Lovette a spreadsheet containing the following chart:

| 8 Piece Quotes | |
| --- | --- |
| Good Guys | $0.9770 |
| [Supplier-9] | $0.9660 |
| [Supplier-6] | $0.9632 |
| Claxton | $0.9620 |
| Koch | $0.9561 |

66.      It was further part of the conspiracy that on or about December 17, 2012, Supplier-6-Employee-2 signed an agreement on behalf of Supplier-6 that the price of 8-piece COB would be $.9622/lb. and the price of dark meat would be .30 back in calendar year 2013.

67.      It was further part of the conspiracy that on or about December 17, 2012, Penn, on behalf of Pilgrim's, and Cooperative-1-Employee-1 signed an agreement that the price of 8-piece COB would be $.9703/lb. and the price of dark meat would be .30

back in calendar year 2013.

68.     It was further part of the conspiracy that on or about December 17, 2012, Brady, on behalf of Claxton, and Cooperative-1-Employee-1 signed an agreement that the price of 8-piece COB would be $.9625/lb. and the price of dark meat would be .305 back in calendar year 2013.

69.     It was further part of the conspiracy that on or about December 17, 2012, Koch signed an agreement that the price of 8-piece COB would be $.9662/lb. and the price of dark meat would be .305 back in calendar year 2013.

### QSR-1's 2013 Request to Supply Reduced-Weight Product

70.     On or about March 5, 2013, Cooperative-1-Employee-1 asked various Suppliers and co-conspirators to provide a quote to supply QSR-1 with a reduced-weight 8-piece COB product.

71.     It was further part of the conspiracy that on or about March 8, 2013, relating to QSR-1 reduced-weight 8-piece COB product, there were multiple communications such as phone calls and text messages between or among co-conspirators.

### QSR-4's 2013 Freezing Charge

72.     In approximately 2013, QSR-4 began requiring its distributors to maintain inventories of frozen 8-piece COB and dark meat to satisfy demand in the event of a supply disruption.

73.     It was further part of the conspiracy that between on or about May 31, 2013, and on or about June 4, 2013, relating to QSR-4's 2013 freezing charge, there

were numerous:

      a.     communications including phone calls between or among co-conspirators, communications between or among co-conspirators and QSR-4, and

      b.     internal Supplier communications.

### QSR-1's Dark Meat Supply for 2014

74.     In approximately autumn of 2013, Cooperative-1 was negotiating with Suppliers for dark meat supply for calendar year 2014.

75.     It was further part of the conspiracy that between on or about October 2013, and the end of 2013, relating to the ongoing negotiations with Cooperative-1 there were numerous:

      a.     communications including phone calls and text messages between or among co-conspirators,

      b.     communications between or among co-conspirators and Cooperative-1, and

      c.     internal Supplier communications, relating to the ongoing negotiations with Cooperative-1.

### QSR-4's Quality Assurance Costs for 2014

76.     In approximately 2013, QSR-4 implemented new quality assurance ("QA") requirements to take effect the following year that required Suppliers to take additional measures to ensure the broiler chicken products met enhanced standards.

77.     It was further part of the conspiracy that between on or about December 20, 2013, and on or about January 26, 2014, relating to QSR-4's quality assurance

costs for 2014, there were numerous:

    a.    communications such as phone calls and emails between or among

co-conspirators,

    b.    communications between or among co-conspirators and QSR-4,

and

    c.    internal Supplier communications.

### *QSR-5's 2014 Conversion to Antibiotic-Free Broiler Chicken Meat*

78.    On or about February 11, 2014, QSR-5 announced plans to serve

antibiotic-free ("ABF") broiler chicken meat at all of its restaurants within the following

five years.

79.    It was further part of the conspiracy that on or about April 1, 2014:

    a.    The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:14 a.m. | GAY | Brady | 6 |
| 9:39 a.m. | GAY | Brady | 2 |
| 9:51 a.m. | Brady | Supplier-8-Employee-1 | 21 |
| 10:18 a.m. | Brady | GAY | 12 |
| 10:51 a.m. | Brady | Supplier-8-Employee-1 | 21 |

    b.    At approximately 11:33 a.m. (EDT), Supplier-8-Employee-1 emailed

Supplier-8-Employee-2: "I also found out that Pilgrim is going to upcharge approx.

$.3124/lb on the ABF product. Claxton will be around the same cost." Supplier-8-

Employee-2 responded: "Great info."

80.    It was further part of the conspiracy that on or about April 18, 2014:

    a.    At approximately 9:38 a.m. (EDT), Mulrenin called Brady. The

duration of the call was approximately 13 minutes.

b.   The following text messages were sent:

| Approx. Time (EDT) | Sender | Recipient | Content |
|---|---|---|---|
| 12:02 p.m. | Brady | Fries | "I talked to Tim [Mulrenin] today at [Supplier-3] and for ABF they are at .02 per lb live weight. He said they are supposed to give a number to [QSR-5] today. I told him we were .31 to .32 per lb on finished product." |
| 1:37 p.m. | Fries | Brady | "Did he say what there finished increase would be?" |
| 1:40 p.m. | Brady | Fries | "Work in progress. I told him what we were doing, [Supplier-8] and pilgrims" |

### *QSR-5's Broiler Chicken Products Supply for 2015*

81.   It was further part of the conspiracy that on or about May 9, 2014—in anticipation of negotiations with QSR-5 for calendar year 2015—GAY emailed Lovette and said: "I think the players in the arena are in agreement that small chickens have to bring a premium as does ensured supply."

82.   It was further part of the conspiracy that on or about July 1 and July 2, 2014, the following communications occurred:

| July 1, 2014 | | | |
|---|---|---|---|
| Approx. Time (EDT) | Initiator | Recipient | Communication |
| 8:57 a.m. | GAY | Brady | Phone Call: Approx. 2 min. |
| 11:33 a.m. | Brady | GAY | Phone Call: Approx. 4 min. |
| July 2, 2014 | | | |
| Approx. Time (EDT) | Initiator | Recipient | Communication |
| 11:55 a.m. | Brady | Fries | "Justin [GAY] said they are reviewing their [QSR-5] grain based model now for 2015. I will check with [Supplier-8] and [Supplier-3]." |
| 11:59 a.m. | Brady | Supplier-8-Employee-1 | Phone Call: Approx. 2 min. |
| 12:00 p.m. | Fries | Brady | "Did he elude to going up or did they seam satisfied with where it was" |
| 12:01 p.m. | Brady | GAY | Phone Call: Approx. 2 min. |
| 12:06 p.m. | Brady | Fries | "He said they actually feel pretty good where there are at and he will call me later to discuss more in detail." |
| 1:31 p.m. | GAY | Brady | Phone Call: Approx. 1 min. |
| 1:47 p.m. | Brady | GAY | Phone Call: Approx. 2 min. |
| 2:00 p.m. | Brady | GAY | Phone Call: Approx. 1 min. |
| 2:19 p.m. | GAY | Brady | Phone Call: Approx. 1 min. |
| 2:30 p.m. | Brady | GAY | Phone Call: Approx. 6 min. |
| 6:19 p.m. | Brady | Fries | "I talked to justin [GAY] and they are going to hold with what they currently have." |

### QSR-1's 8-Piece COB Supply for 2015

83.     Beginning approximately in the summer of 2014, Cooperative-1 was negotiating with Suppliers for 8-piece COB prices to take effect in approximately 2015. One of the price terms negotiated was each Supplier's increased margin for 8-piece COB above their respective margins for calendar year 2014.

84.     The Suppliers' prices for 8-piece COB sold directly or indirectly to QSR-1 franchisees in calendar year 2014 included the following margins:

| Supplier | CY 2014 Margin |
|----------|----------------|
| Pilgrim's | $.1175/lb. |
| Claxton | $.0673/lb. |
| Supplier-3 | $.0750/lb. |
| Supplier-4 | $.1100/lb. |
| Koch | $.0900/lb. |
| Supplier-6 | $.0967/lb. |
| Supplier-7 | $.0900/lb. |

85.     There were multiple rounds of negotiations between Cooperative-1 and Suppliers.

*Round One of Negotiations*

86.     In or around August 2014, Cooperative-1-Employee-3 instructed Suppliers to submit a proposed cost-plus pricing model by on or about August 19, 2014.

87.     It was further part of the conspiracy that on or about August 1, 2014, MCGUIRE, Austin, and another Pilgrim's employee had a pre-negotiation meeting with employees of Cooperative-1.

88.     It was further part of the conspiracy that on or about August 7, 2014, MCGUIRE emailed Penn and said: "[W]e are going to change the small bird industry this upcoming year no doubt. I told [Pilgrim's-Employee-8] after the [QSR-1] meeting last week that we just need our competition to get out of the way so we can get some things done, be better for us and them in the end." Penn responded to MCGUIRE and said: "In 2013 I had a few owners of small bird companies thank us via me for getting our act together. I guess it will happen again...good work. Forward..."

89.     It was further part of the conspiracy that on or about August 11, 2014, the following communications occurred:

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| 3:52 p.m. | Roberts | Brady | *Phone Call:* Approx. 20 min. |
| 5:22 p.m. | Roberts | Cooperative-1-Employee-3 | *Email:* Supplier-3's proposed cost-plus pricing model sent to Cooperative-1-Employee-3 |
| 6:13 p.m. | Cooperative-1-Employee-4 | Roberts | *Email:* "You trying to get me fired before I even move here??" |

90.     It was further part of the conspiracy that on or about August 12, 2014, Pilgrim's-Employee-7—who was in the midst of negotiating calendar year 2015 prices for broiler chicken products with Restaurant-1—emailed MCGUIRE to express frustration with the state of the negotiations. MCGUIRE responded and said: "Don't worry we are working on plans to put you in an extremely favorable negotiating position by [the end of the year]."

91.     It was further part of the conspiracy that on or about August 14, 2014, Mulrenin promised to call Cooperative-1-Employee-4 about Supplier-3's recently submitted cost model on August 15, 2014.

92.     It was further part of the conspiracy that on or about August 15, 2014, the following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 11:34 a.m. | Mulrenin | Roberts | 0.5 |
| 11:35 a.m. | Roberts | Brady | 4 |
| 11:42 a.m. | Roberts | Mulrenin | 9 |
| 3:27 p.m. | Roberts | Mulrenin | 22 |
| 3:50 p.m. | Roberts | Penn | 0.5 |
| 3:52 p.m. | Penn | Roberts | 16 |
| 4:11 p.m. | Mulrenin | Roberts | 2 |

93.    It was further part of the conspiracy that on or about August 18, 2014:

a.    The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:41 a.m. | Little | Kantola | 7 |
| 10:34 a.m. | Little | Austin | 6 |
| 12:04 p.m. | Austin | Brady | 24 |
| 1:25 p.m. | Little | Austin | 11 |
| 1:52 p.m. | Austin | Supplier-6 | 2 |
| 2:03 p.m. | Penn | Austin | 6 |
| 2:41 p.m. | Little | Supplier-3-Employee-1 | 11 |
| 2:58 p.m. | GAY | Brady | 14 |
| 3:21 p.m. | Austin | Little | 17 |
| 5:56 p.m. | MCGUIRE | Austin | 2 |

b.    At approximately 6:01 p.m. (EDT), MCGUIRE emailed a

spreadsheet to Penn containing the following chart:

|  | Current M | New Marg |
|---|---|---|
| **Koch** | 0.09 | 0.22 |
| **[Supplier-4]** | 0.11 | 0.22 |
| **Claxton** | 0.0675 | 0.22 |
| **[Supplier-6]** |  | .15-.18 inc |
| **[Supplier-7]** | 0.1 | 0.23 |

c.      At approximately 6:46 p.m. (EDT), MCGUIRE emailed Penn:

i.      MCGUIRE said "Roger [Austin] did some checking around today and I included the below regarding the range of the total increases (margin and costs) folks are going in with," and then reported the numbers to Penn: Claxton at .14-.16/lb., Supplier-4 at .13-.15/lb., Koch at .14-.16/lb., Supplier-6 at .15-.17/lb., and Supplier-7 at .14-.16/lb.

ii.     MCGUIRE also said "Considering the numbers above and the fact that we wanted to be the leader this would put us in at .1616/lb increase (.06 in cost and .10 in margin) which would equate to about $400k in additional revenue on equal volume from this year."

d.      Penn responded to MCGUIRE email saying, "Will review with Bill [Lovette] in am. Will advise." and asking, "2.5 M lbs X. 16 =$400k per week is the math?"

94.     It was further part of the conspiracy that on or about August 19, 2014:

a.      At approximately 11:55 a.m. (EDT), Kantola submitted Koch's proposed cost-plus pricing model to Cooperative-1.

b.      The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 2:18 p.m. | Austin | Brady | 4 |
| 2:33 p.m. | Brady | Kantola | 0.2 |
| 2:34 p.m. | Brady | Kantola | 0.5 |
| 3:22 p.m. | Kantola | Brady | 20 |

      c.      At approximately 4:48 p.m. (EDT), Brady submitted Claxton's proposed cost-plus pricing model to Cooperative-1.

95.     It was further part of the conspiracy that by on or about August 20, 2014, Suppliers submitted proposed cost-plus pricing models to Cooperative-1 with the following proposed margins and effective margins:

| Supplier | CY 2014 Margin | Proposed Margin |
|---|---|---|
| Pilgrim's | $.1175/lb. | $.2175/lb. |
| Claxton | $.0673/lb. | $.2200/lb. |
| Supplier-3 | $.0750/lb. | $.1600/lb. |
| Supplier-4 | $.1100/lb. | -- |
| Koch | $.0900/lb. | $.2200/lb. |
| Supplier-6 | $.0967/lb. | $.2070-$.2174/lb. |
| Supplier-7 | $.0900/lb. | $.2300/lb. |

96.     It was further part of the conspiracy that on or about August 20, 2014, the following email exchange occurred:

| Email Initiator | Email Recipient | Content |
|---|---|---|
| MCGUIRE | Austin | "Any word from them on our proposal?" |
| Austin | MCGUIRE | "I heard they made a couple of calls and were surprised." |
| MCGUIRE | Austin | "Surprised like how much higher everyone else was?" |
| Austin | MCGUIRE | "Yes" |

*Round Two of Negotiations*

97.     It was further part of the conspiracy that on or about August 22, 2014, Roberts emailed Supplier-3's proposed cost-plus pricing model to Cooperative-1-Employee-4 with a margin of $.1900/lb. Cooperative-1-Employee-4 responded to Roberts' email saying: "Looks like to me you want about 15.5 cents increase in costs and margin?"

98.     It was further part of the conspiracy that on or about August 25, 2014, the following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:21 a.m. | Little | Kantola | 20 |
| 11:04 a.m. | Little | Blake | 11 |
| 11:15 a.m. | Blake | Supplier-3-Employee-1 | 0.5 |
| 11:30 a.m. | Brady | Kantola | 17 |
| 1:05 p.m. | Supplier-3-Employee-1 | Blake | 6 |

99.     It was further part of the conspiracy that on or about August 26, 2014, the following occurred:

a.      At approximately 9:31 a.m. (EDT), Austin emailed Penn and explained that Cooperative-1-Employee-2 had asked Pilgrim's to reduce its proposed price increase by approximately one half. Austin also said he planned to call Cooperative-1 to hold firm on the increase. Penn responded that he agreed with Austin's plan.

b.      At approximately 9:55 a.m. (EDT), Kantola called Brady for

approximately 6 minutes.

c.      At approximately 10:30 a.m. (EDT), Kantola was scheduled to
participate in a meeting between Koch and Cooperative-1.

d.      The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 1:31 p.m. | Cooperative-1 | Austin | 17 |
| 1:48 p.m. | Austin | Penn | 2 |
| 1:58 p.m. | Lovette | Austin | 15 |
| 2:52 p.m. | Austin | Brady | 14 |

e.      At approximately 5:11 p.m. (EDT), Brady texted Fries: "I talked to
roger [Austin] about [QSR-1] and Greeley, [Colorado] told him not to come down on
price. He called [Cooperative-1-Employee-3] today and told him." At approximately 5:31
p.m. (EDT), Fries responded: "Wow!"

100.    It was further part of the conspiracy that on or about August 27, 2014, the
following communications occurred:

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:46 a.m. | Fries | Supplier-7-Employee-2 | *Phone Call:* Approx. 2 min. |
| 10:02 a.m. | Brady | Kantola | *Phone Call:* Approx. 15 min. |
| 10:33 a.m. | Brady | Fries | *Text Msg:* "Koch is not moving either" |
| 10:34 a.m. | Fries | Brady | *Text Msg:* [Supplier-7-Employee-2] is [meeting with Cooperative-1] at 11. They are agreeing to anything today, just listening." |

101.    It was further part of the conspiracy that on or about August 28, 2014:

a.    the following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:03 a.m. | Little | Kantola | 8 |
| 10:24 a.m. | Blake | Supplier-3-Employee-1 | 0.25 |
| 10:24 a.m. | Blake | Austin | 16 |
| 10:53 a.m. | Supplier-3-Employee-1 | Blake | 4 |
| 2:40 p.m. | Kantola | Austin | 30 |

b.    TUCKER emailed another Pilgrim's employee and said: "Everybody will be paying through the nose. [QSR-1] will be paying close to $0.30 [more per pound] between price increase and case weight increase." The employee responded: "Good. Get it while we can!!" TUCKER replied: "Once [QSR-1] is inked, we'll be hitting these others starting next week."

102.    It was further part of the conspiracy that on or about August 29, 2014, the following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:50 a.m. | Supplier-7 | Penn | 19 |
| 10:38 a.m. | Fries | Supplier-7-Employee-1 | 19 |
| 11:31 a.m. | Brady | Kantola | 9 |

103.    It was further part of the conspiracy that on a piece of paper with a handwritten notation "8-29-14" Supplier-7-Employee-1 wrote:

a.    "Talked to [Supplier-4-Employee-1]. They are up .19 & holding."

b.      "[Supplier-3] 1.0976 per [Supplier-7-Employee-4]"

c.      "Talked to Jason Penn [Penn] +8 cost +11 margin"

d.      "Claxton 1.1099 up 18.35"

104.    On or about August 29, 2014, Cooperative-1-Employee-3 sent an email to Suppliers requesting final pricing by on or about September 2, 2014, or September 3, 2014.

105.    On or about September 3, 2014, Cooperative-1-Employee-2 sent Roberts a telephonic-meeting invitation for later that day at 1:30 p.m. (EDT). The invitation's subject line was "COB [Supplier-3]" and included an "Agenda" with 5 items:

a.      "[Supplier-3] wants a ridiculous price for COB"

b.      "[Cooperative-1] says NO"

c.      "[Cooperative-1] shamefully tells [Supplier-3] that we have bought poultry at ridiculous price from others"

d.      "[Supplier-3] informs [Cooperative-1] – Really, YOU ARE SCREWED"

e.      "GO from there."

106.    It was further part of the conspiracy that on or about September 3, 2014:

a.      The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:38 a.m. | Brady | Cooperative-1-Employee-3 | 2 |
| 9:41 a.m. | Brady | Kantola | 1 |
| 9:42 a.m. | Brady | Austin | 16 |
| 10:00 a.m. | Brady | Kantola | 1 |

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 10:02 a.m. | Kantola | Brady | 11 |
| 10:17 a.m. | Brady | Fries | 1 |
| 10:22 a.m. | Fries | Brady | 7 |
| 11:10 a.m. | Brady | Cooperative-1-Employee-3 | 2 |
| 11:24 a.m. | Cooperative-1 | Brady | 5 |
| 11:37 a.m. | Brady | Mulrenin | 1 |
| 11:45 a.m. | Brady | Mulrenin | 2 |
| 1:15 p.m. | Brady | Mulrenin | 17 |
| 1:31 p.m. | Brady | Austin | 19 |
| 2:01 p.m. | Blake | Austin | 8 |
| 2:03 p.m. | Brady | Kantola | 7 |
| 2:10 p.m. | Brady | Fries | 20 |
| 3:39 p.m. | Brady | Cooperative-1-Employee-3 | 15 |
| 4:24 p.m. | Austin | Brady | 8 |
| 4:54 p.m. | Brady | Kantola | 4 |

b.      At approximately 5:15 p.m. (EDT), Brady texted Fries: "Told [Cooperative-1-Employee-3] we would go down .02 he said someone moved down .04 it has to be [Supplier-6] or he is bluffing. Roger [Austin] and bill [Kantola] are not moving."

107.    It was further part of the conspiracy that on or about September 19, 2014, STILLER told another Pilgrim's employee: "Got [QSR-1] and [QSR-6]. Rest still to come. Everybody is getting that price increase."

108.    It was further part of the conspiracy that by on or about December 24, 2014, Suppliers had signed cost-plus pricing agreements for calendar year 2015 with

Cooperative-1 with the following margins and effective margins:

| Supplier | CY 2014 Margin | Proposed Margin | CY 2015 Margin |
|---|---|---|---|
| Pilgrim's | $.1175/lb. | $.2175/lb. | $.2175/lb. |
| Claxton | $.0673/lb. | $.2200/lb. | $.1940/lb. |
| Supplier-3 | $.0750/lb. | $.1600/lb. | $.1931/lb. |
| Supplier-4 | $.1100/lb. | -- | $.2161/lb. |
| Koch | $.0900/lb. | $.2200/lb. | $.2200/lb. |
| Supplier-6 | $.0967/lb. | $.2070-$.2174/lb. | $.1798/lb. |
| Supplier-7 | $.0900/lb. | $.2300/lb. | $.2300/lb. |

109.    It was further part of the conspiracy that in calendar year 2015, including as late as approximately December 26, 2015, Pilgrim's sold and accepted payment for 8-piece COB through a distributor to QSR-1 franchisees in the United States at a margin of $.2175.

### *QSR-3's 8-Piece COB Supply for 2015*

110.    In approximately the autumn of 2014, QSR-3 was negotiating with Suppliers for its 2015 8-piece COB pricing. On or about September 12, 2014, QSR-3-Employee-2 solicited bids from Suppliers via email for "[QSR-3's] 2015 Fresh Chicken Program." In the solicitation, QSR-3-Employee-2 included a memo expressing QSR-3's expectation that broiler chicken prices for calendar year 2015 would be lower than broiler chicken prices for calendar year 2014: "Thanks to an even better grain harvest again this year, the costs to grow a pound of chicken will be at its lowest cost in many years. The Poultry industry looks to expand more of their output, which makes 2015 a profitable year for us all." TUCKER forwarded QSR-3-Employee-2's email to GAY and said: "Check out the memo." GAY responded and said: "You better give them a low price….after all, due to record grain, cost will be low……wow." TUCKER replied and

said: "They are morons."

111.   It was further part of the conspiracy that on or about October 8, 2014, the

following email exchange occurred between STILLER and TUCKER:

| STILLER | "Anything from your buddies at [QSR-3]?" |
| TUCKER | "Not a peep. I talked to [Supplier-7] today and they've not heard anything either." |
| STILLER | "Interesting…was their pricing similar?" |
| TUCKER | "Very. Others were higher." |

112.   It was further part of the conspiracy that on or about October 17, 2014, the

following text message exchange occurred between Penn and STILLER:

| Penn | "Who is negotiating with [QSR-3]?" |
| STILLER | "Scott [TUCKER] and Roger [Austin]" |
| Penn | "Ok. Thanks" |
| STILLER | "We know [Supplier-7], their biggest supplier is 0.02 higher than us and they are not going to negotiate." |
| Penn | "Good deal. Last time they did cave a cent or two with [QSR-1]" |
| STILLER | "They are listening to my direction" |
| Penn | "Who is they?" |
| Penn | "If they is illegal don't tell me" |
| STILLER | "Was referring to roger [Austin] listening. Sorry, thought you were referring to roger [Austin] caving. Got you on [Supplier-7] caving on [QSR-1]. [Supplier-7] might cave but I wouldn't think for our volume and their current." |
| Penn | "[Supplier-3] does the west. Hearing rumors out of them?" |
| STILLER | "Buyer said we were .07 high so that must be [Supplier-3's] price…" |
| Penn | "They are morons" |
| STILLER | ".07 back is in line with where we have priced everybody else but they did not add anything for the cost of doing business with [QSR-3] like us and [Supplier-7] did" |
| Penn | "[Supplier-7] is a solid competitor." |

113.   It was further part of the conspiracy that on or about November 7, 2014, STILLER told Penn: "[QSR-3] just called back...came up on price. Would net somewhere around 1.00 and we went in at 1.04/1.08."

114.   It was further part of the conspiracy that on or about November 9, 2014, Penn told Lovette: "I raised [QSR-3] 15c per lb" and "[QSR-3-Employee-1] and his crew will pay market price plus the special A-Hole Premium."

115.   It was further part of the conspiracy that on or about November 10, 2014 at approximately 10:49 a.m. (EST), STILLER emailed TUCKER and Austin: "I do not really want to get into a pricing war with [Supplier-7] over those two DCs."

### Protecting the Purpose and Effectiveness of the Conspiracy

116.   It was further part of the conspiracy that on or about November 24, 2014, after Supplier-3 asked to purchase broiler chicken products from Pilgrim's to cover a shortfall to Grocer-1-Brand-1 for approximately $.05/lb. more than the price Pilgrim's had negotiated with Grocer-1, Penn and Lovette, along with other co-conspirators, decided not to cover Supplier-3's shortage.

### QSR-2's 2015 Bone-In Promotional Discount

117.   It was QSR-2's practice to periodically offer promotional pricing to its customers on certain broiler chicken products for limited periods of time, often for a particular month such as September.

118.   On or about March 25, 2015, Cooperative-2-Employee-1 asked Suppliers if QSR-2 could get "some type of discount" for a promotion in approximately September 2015 "[d]ue to the increases we incurred this year."

119.   It was further part of the conspiracy that on or about March 26, 2015:

a.   The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 1:41 p.m. | Supplier-3-Employee-1 | Brady | 2 |
| 1:43 p.m. | Supplier-3-Employee-1 | Blake | 0.5 |
| 1:45 p.m. | Supplier-3-Employee-1 | TUCKER | 0.5 |

b.   At approximately 8:22 p.m. (EDT), Supplier-3-Employee-1 forwarded Cooperative-2-Employee-1's email to Supplier-3-Employee-2, saying: "I have talked to a couple company's and they are thinking .02lb for September" and "Only bad thing is everyone else does it, it will be hard not to do it."

120.   It was further part of the conspiracy that on or about March 27, 2015:

a.   At approximately 10:30 a.m. (EDT), Supplier-3-Employee-2 told Supplier-3-Employee-1: "We discussed this morning, and we agree to offer the $0.02/lb. for the month of September."

b.   At approximately 10:40 a.m. (EDT), Supplier-3-Employee-1 sent a text message to Brady.

c.   At approximately 10:42 a.m. (EDT), Blake called Supplier-3-Employee-1. The duration of the call was approximately 3 minutes and 15 seconds.

121.   On or about March 27, 2015, Cooperative-2-Employee-1 told GAY: "[Supplier-3], [Supplier-6], [Supplier-4] and Claxton all $.02[.] I'm waiting on you[,] Koch and [Supplier-7]."

122.   It was further part of the conspiracy that on or about March 31, 2015:

32

a.   The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
| --- | --- | --- | --- |
| 8:58 a.m. | Kantola | Blake | 0 |
| 9:00 a.m. | Kantola | Little | 8 |
| 9:09 a.m. | Kantola | Brady | 1 |
| 9:45 a.m. | Austin | Kantola | 9 |
| 11:33 a.m. | Brady | Kantola | 7 |
| 12:11 p.m. | Blake | Kantola | 6 |

b.   At approximately 5:27 p.m. (EDT), STILLER told Penn: "[QSR-2] is looking to get a $0.02/lb discount from all suppliers for a September promotion. [Supplier-3], Koch, [Supplier-4], [Supplier-7], [Supplier-6], and Claxton have already agreed to the discount."

123.   It was further part of the conspiracy that on or about April 1, 2015:

a.   At approximately 12:22 p.m. (EDT), Kantola emailed Cooperative-2-Employee-1 and said Koch would give a $.02/lb. discount.

b.   Penn approved providing QSR-2 with a $.02/lb. discount.

### Distributor-1's Line-of-Credit Term

124.   In approximately 2016, Distributor-1 contacted Pilgrim's and Koch individually to negotiate longer terms for their respective lines of credit.

125.   On or about May 1, 2016, there was an email exchange between Koch-Employee-1 and Lovette relating to Distributor-1's line-of-credit term.

### QSR-1's Broiler Chicken Products for 2018

126.   In or around January 2017, Cooperative-1 was negotiating with Suppliers

for 2018 broiler chicken products.

127.    It was further part of the conspiracy that on or about Monday, January 16, 2017, between approximately 2:40 p.m. (EST) and approximately 4:51 p.m. (EST), there were at least 5 phone calls between Brady and Austin. The cumulative duration of the calls was approximately 15 minutes.

128.    It was further part of the conspiracy that on or about Tuesday, January 17, 2017:

    a.    At approximately 10:11 a.m. (EST), Austin called Brady. The duration of the call was approximately 2 minutes.

    b.    At approximately 12:54 p.m. (EST), Austin told TUCKER, "Claxton meets with [Cooperative-1] in Thursday and i will get a blow by blow Friday morning. Koch meets with [Cooperative-1] in Friday."

129.    It was further part of the conspiracy that on or about Wednesday, January 18, 2017, at approximately 2:45 p.m. (EST), Austin called Brady. The duration of the call was approximately 1 minute.

130.    It was further part of the conspiracy that on or about Thursday, January 19, 2017, Claxton met with Cooperative-1.

131.    It was further part of the conspiracy that on or about Friday, January 20, 2017, at approximately 3:12 p.m. (EST), Austin called Brady. The duration of the call was approximately 7 minutes.

132.    It was further part of the conspiracy that on or about January 27, 2017, Pilgrim's met with Cooperative-1.

133.    It was further part of the conspiracy that on or about February 17, 2017, the following text message exchange occurred:

| Text Sender | Text Recipient | Content |
|---|---|---|
| STILLER | Austin | "Taking a test but what does [Cooperative-1-Employee-2] mean?" |
| Austin | STILLER | "I got off the phone with [Cooperative-1-Employee-4] right before that came. [Cooperative-1-Employee-4] told me that the level for the product they are seeing is $49 a case.  Translated that means 3.75 – 4.0 cents lower than we bid." |
| STILLER | Austin | "Fucking joke" |
| STILLER | Austin | "7 cent reduction…. unreal. guess i better find a new 100MM lb customer" |
| Austin | STILLER | "I don't disagree" |
| STILLER | Austin | "Need you tell industry we are going to hold" |
| Austin | STILLER | "Will do" |

134.    It was further part of the conspiracy that on or about February 20, 2017, the following communications occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:42 a.m. | Brady | Austin | *Phone Call*: Approx. 16 min. |
| 10:06 a.m. | STILLER | Austin | *Text Message*: "Shall we plan call for wednesday am to discuss COB? Give you some time to do your due deligence" |
| 10:58 a.m. | Austin | Kantola | *Phone Call*: Approx. 0.5 min. |
| 11:50 a.m. | Kantola | Austin | *Phone Call*: Approx. 13 min. |

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 4:26 p.m. | Blake | Austin | *Phone Call*: Approx. 13 min. |

**135.** It was further part of the conspiracy that on or about February 23, 2017, at approximately 10:34 a.m. (EST), Austin called Blake. The duration of the call was approximately 5 minutes.

### QSR-2's 8-Piece COB Supply for 2018 and 2019

136. In approximately 2017, Cooperative-2 was negotiating 8-piece COB prices with Suppliers for calendar years 2018 and 2019, and sought to lower the 8-piece COB prices QSR-2 paid for calendar year 2017.

137. On or about August 16, 2017, Cooperative-2-Employee-1 sent an email blind copying various Suppliers—including at least Supplier-3, Supplier-6, and Supplier-7—to solicit bids for QSR-2's 2018 8-piece COB. In the email, Cooperative-2-Employee-1 told Suppliers: "I am aware of what went on with Brand X and in fact the change took place during the current agreement year. I would also like you to keep that in mind while submitting your bid. Instead of a big cut next year I would entertain a two year price adjustment. Let me see what you can come up with." Cooperative-2-Employee-1 asked for price proposals to be submitted by September 5, 2017.

138. It was further part of the conspiracy that on or about August 16, 2017, Supplier-3-Employee-1 forwarded the solicitation to Mulrenin, asking "You get this?" Mulrenin responded: "Ouch. I did not. Definitely appears he's under the impression we all dropped prices more than we did."

139. It was further part of the conspiracy that on or about August 18, 2017,

Supplier-3-Employee-1 told Mulrenin, "[Cooperative-2-Employee-1] heard as much as .05lb. I told them that was probably because they were so far out of line now with pricing they had to do something to get close. I think realistically he is thinking .02-.03."

140.   It was further part of the conspiracy that on or about August 22, 2017, Mulrenin said to Supplier-3-Employee-2: "He's aware suppliers came down for [QSR-1] and expecting some movement from us."

141.   It was further part of the conspiracy that on or about September 5, 2017:

a.   The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 10:27 a.m. | GAY | Brady | 11 |
| 11:32 a.m. | Supplier-3-Employee-1 | Brady | 10 |
| 2:30 p.m. | GAY | Brady | 4 |

b.   An employee of Supplier-6 sent Cooperative-2-Employee-1 a proposal to reduce the 2018 8-piece COB by $.0075/lb. and the 2019 price of 8-piece COB by $.0150/lb.

c.   GAY sent Cooperative-2-Employee-1 a proposal to reduce the 2018 price of 8-piece COB by $.01/lb. and the 2019 price of 8-piece COB by $.01/lb.

d.   Brady sent Cooperative-2-Employee-1 a proposal to reduce the 2018 price of 8-piece COB by $.01/lb.

142.   It was further part of the conspiracy that on or about September 6, 2017, the following events occurred:

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:07 a.m. | Cooperative-2- | Supplier-3- | *Email:* "I did not receive your bid?" |

37

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
|  | Employee-1 | Employee-1 |  |
| 9:37 a.m. | Supplier-3-Employee-1 | Blake | *Phone Call:* Approx. 10 min. |
| 9:48 a.m. | Supplier-3-Employee-1 | Mulrenin | *Phone Call:* Approx. 0 min. |
| 9:48 a.m. | Supplier-3-Employee-1 | Mulrenin | *Text Msg:* "U with your customers" |
| 11:33 a.m. | Mulrenin | Supplier-3-Employee-1 | *Text Msg:* "Yes. What's up?" |
| 11:34 a.m. | Supplier-3-Employee-1 | Mulrenin | *Text Msg:* "[QSR-2] proposal" |
| 11:34 a.m. | Supplier-3-Employee-1 | Mulrenin | *Text Msg:* "Got a general idea what [Supplier-6] is doing" |
| 11:34 a.m. | Mulrenin | Supplier-3-Employee-1 | *Text Msg:* "Ok. Call [Supplier-3-Employee-2]. I will call you as soon as I can" |
| 11:44 a.m. | Supplier-3-Employee-1 | Mulrenin | *Text Msg:* "Called [Supplier-3-Employee-2] and told him what I heard [Supplier-6] was doing & also told him about [Supplier-7]. Said would get back with me this afternoon" |
| 11:54 a.m. | Mulrenin | Supplier-3-Employee-1 | *Text Msg:* "Thanks!" |
| 1:41 p.m. | Cooperative-2-Employee-1 | Supplier-3-Employee-1 | *Phone Call:* Approx. 5 min. |
| 1:49 p.m. | Supplier-3-Employee-1 | Mulrenin | *Text Msg:* "Just got some info from [QSR-2]. Everyone seems to be doing 2 years and spreading it out. I was told everyone is coming in at 2 1/4-2 1/2 over 2 years. All other billing weights are at least 1 1/2 less than us except for what I told you [Supplier-7] was but they are around .0165 less than us." |

143.    It was further part of the conspiracy that on or about September 7, 2017,

Supplier-3-Employee-1 sent Cooperative-2-Employee-1 an email, copying Mulrenin,

with a proposal to reduce the 2018 price of 8-piece COB by $.01/lb. and the 2019 price of 8-piece COB by an additional $.01/lb.

IV.    <u>TRADE AND COMMERCE</u>

144.    During the period covered by this Indictment, the Defendants and their co-conspirators shipped substantial quantities of broiler chicken products by truck in a continuous and uninterrupted flow of interstate trade and commerce to companies located in states outside the place of origin of the shipments.

145.  During the period covered by this Indictment, the business activities of the Defendants and their co-conspirators in connection with the sale of broiler chicken products were within the flow of, and substantially affected, interstate trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

A TRUE BILL:

<u>Ink signature on file in Clerk's Office</u>
FOREPERSON

s/Richard A. Powers                          James J. Fredericks
RICHARD A. POWERS                            JAMES J. FREDRICKS
Acting Assistant Attorney General            Chief, Washington Criminal II Section


                                             s/Yixi (Cecilia Cheng
MARVIN N. PRICE JR.                          YIXI (CECILIA) CHENG
Director of Criminal Enforcement             MICHAEL KOENIG
                                             JILLIAN M. ROGOWSKI
Antitrust Division                           Trial Attorneys
U.S. Department of Justice
                                             Antitrust Division
                                             U.S. Department of Justice
                                             Washington Criminal II Section
                                             450 Fifth Street, N.W.
                                             Washington, D.C. 20530
                                             Tel: (202) 705-8342
                                             Yixi.Cheng@usdoj.gov